**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| VIDEOSHARE, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC., a Delaware corporation; and YOUTUBE, LLC, a Delaware limited liability company.<br><br>Defendant. | Civil Action No: 13-cv-990 (GMS)<br><br>**Jury Demanded** |
| VIDEOSHARE, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>VIMEO, LLC, a Delaware limited liability company.<br><br>Defendant. | Civil Action No: 13-cv-992 (GMS)<br><br>**Jury Demanded** |

**Declaration of Professor Kevin Almeroth**

I, Kevin Almeroth, declare as follows:

## I. Introduction.

1. I am currently a Professor in the Department of Computer Science at the University of California, Santa Barbara (UCSB). I also hold an appointment and am a founding member of the Computer Engineering (CE) Program. I am a founding member of the Media Arts and Technology (MAT) Program and the Technology Management Program (TMP). I have been a faculty member at UCSB since July 1997.

2. I have been retained on behalf of VideoShare LLC in connection with the above-captioned litigation. In this report, I have been asked to provide an opinion about what a person of ordinary skill in the art in the time period around 2000 would have understood certain terms in U.S. Patent Nos. 8,438,608 (the "'608 Patent") and 8,464,302 (the "'302 Patent") to mean.

3. The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available. If, for example, Defendants in this case submit an expert declaration in connection with their claim construction brief, I reserve the right to modify and supplement my opinions upon my review of the declaration.

## II. Qualifications.

4. I hold three degrees from the Georgia Institute of Technology: (1) a Bachelor of Science degree in Information and Computer Science (with minors in Economics, Technical Communication, American Literature) earned in June, 1992; (2) a Master of Science degree in Computer Science (with specialization in Networking and Systems) earned in June, 1994; and (3) a Doctor of Philosophy (Ph.D.) degree in Computer Science (Dissertation Title: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia System, minor in Telecommunications Public Policy) earned in June, 1997.

5. One of the major themes of my research has been the delivery of multimedia content and data between computing devices and users. In my research I have looked at large-scale content delivery systems and the use of servers located in a variety of geographic locations to provide scalable delivery to hundreds, even thousands, of users simultaneously. I have also looked at smaller-scale content delivery systems in which content, including interactive communication like voice and video data, is exchanged between computers and portable

computing devices. As a broad theme, my work has examined how to exchange content more efficiently across computer networks, including the devices that switch and route data traffic. More specific topics include the scalable delivery of content to many users, mobile computing, satellite networking, delivering content to mobile devices, and network support for data delivery in wireless network.

6. Beginning in 1992, when I started graduate school, the first focus of my research was on the provision of interactive functions (VCR-style functions like pause, rewind, and fast-forward) for near video-on-demand systems in cable systems, in particular, how to aggregate requests for movies at a cable head-end and then how to satisfy a multitude of requests using one audio/video stream broadcast to multiple receivers simultaneously. Continued evolution of this research has resulted in the development of new techniques to scalably deliver on-demand content, including audio, video, web documents, and other types of data, through the Internet and over other types of networks, including over cable systems, broadband telephone lines, and satellite links.

7. An important component of my research from the very beginning has been investigating the challenges of communicating multimedia content between computers and across networks. Although the early Internet was designed mostly for text-based non-real time applications, the interest in sharing multimedia content quickly developed. Multimedia-based applications ranged from downloading content to a device to streaming multimedia content to be instantly used. One of the challenges was that multimedia content is typically larger than text-only content but there are also opportunities to use different delivery techniques since multimedia content is more resilient to errors. I have worked on a variety of research problems and used a number of systems that were developed to deliver multimedia content to users.

8. In 1994, I began to research issues associated with the development and deployment of a one-to-many communication facility (called "multicast") in the Internet (first deployed as the Multicast Backbone, a virtual overlay network supporting one-to-many communication). Some of my more recent research endeavors have looked at how to use the scalability offered by multicast to provide streaming media support for complex applications like distance learning, distributed collaboration, distributed games, and large-scale wireless communication. Multicast has also been used as the delivery mechanism in systems that perform local filtering (i.e., sending the same content to a large number of users and allowing them to filter locally content in which they are not interested).

9. Starting in 1997, I worked on a project to integrate the streaming media capabilities of the Internet together with the interactivity of the web. I developed a project called the Interactive Multimedia Jukebox (IMJ). Users would visit a web page and select content to view. The content would then be scheduled on one of a number of channels, including delivery to students in Georgia Tech dorms delivered via the campus cable plant. The content of each channel was delivered using multicast communication.

10. In the IMJ, the number of channels varied depending on the capabilities of the server including the available bandwidth of its connection to the Internet. If one of the channels was idle, the requesting user would be able to watch their selection immediately. If all channels were streaming previously selected content, the user's selection would be queued on the channel with the shortest wait time. In the meantime, the user would see what content was currently playing on other channels, and because of the use of multicast, would be able to join one of the existing channels and watch the content at the point it was currently being transmitted.

11. The IMJ service combined the interactivity of the web with the streaming capabilities of the Internet to create a jukebox-like service. It supported true Video-on-Demand when capacity allowed, but scaled to any number of users based on queuing requested programs. As part of the project, we obtained permission from Turner Broadcasting to transmit cartoons and other short-subject content. We also attempted to connect the IMJ into the Georgia Tech campus cable television network so that students in their dorms could use the web to request content and then view that content on one of the campus's public access channels.

12. More recently, I have also studied issues concerning how users choose content, especially when considering the price of that content. My research has examined how dynamic content pricing can be used to control system load. By raising prices when systems start to become overloaded (i.e., when all available resources are fully utilized) and reducing prices when system capacity is readily available, users' capacity to pay as well as their willingness can be used as factors in stabilizing the response time of a system. This capability is particularly useful in systems where content is downloaded or streamed to users on-demand.

13. As a parallel research theme, starting in 1997, I began researching issues related to wireless devices. In particular, I was interested in showing how to provide greater communication capability to "lightweight devices," i.e., small form-factor, resource-constrained (e.g., CPU, memory, networking, and power) devices. Starting by at least 2004 I researched techniques to wirelessly disseminate information, for example advertisements, between users using ad hoc networks. In the system, called Coupons, an incentive scheme is used to encourage users to relay information, including advertisements, to other nearby users.

14. Starting in 1998, I published several papers on my work to develop a flexible, lightweight, battery-aware network protocol stack. The lightweight protocols we envisioned were

similar in nature to protocols like Universal Plug and Play (UPnP) and Digital Living Network Alliance (DLNA).

15. From this initial work, I have made wireless networking—including ad hoc and mesh networks and wireless devices—one of the major themes of my research. One topic includes developing applications for mobile devices, for example, virally exchanging and tracking "coupons" through "opportunistic contact" (i.e., communication with other devices coming into communication range with a user). Other topics include building network communication among a set of mobile devices unaided by any other kind of network infrastructure. Yet another theme is monitoring wireless networks, in particular different variants of IEEE 802.11 compliant networks, to (1) understand the operation of the various protocols used in real-world deployments, (2) use these measurements to characterize use of the networks and identify protocol limitations and weaknesses, and (3) propose and evaluate solutions to these problems.

16. As an important component of my research program, I have been involved in the development of academic research into available technology in the market place. One aspect of this work is my involvement in the Internet Engineering Task Force (IETF) including many content delivery-related working groups like the Audio Video Transport (AVT) group, the MBone Deployment (MBONED) group, Source Specific Multicast (SSM) group, the Inter-Domain Multicast Routing (IDMR) group, the Reliable Multicast Transport (RMT) group, the Protocol Independent Multicast (PIM) group, etc. I have also served as a member of the Multicast Directorate (MADDOGS), which oversaw the standardization of all things related to multicast in the IETF. Finally, I was the Chair of the Internet2 Multicast Working Group for seven years.

17. I am an author or co-author of nearly 200 technical papers, published software systems, IETF Internet Drafts and IETF Request for Comments (RFCs).

18. My involvement in the research community extends to leadership positions for several journals and conferences. I am the co-chair of the Steering Committee for the ACM Network and System Support for Digital Audio and Video (NOSSDAV) workshop and on the Steering Committees for the International Conference on Network Protocols (ICNP), ACM Sigcomm Workshop on Challenged Networks (CHANTS), and IEEE Global Internet (GI) Symposium. I have served or am serving on the editorial boards of IEEE/ACM Transactions on Networking, IEEE Transactions on Mobile Computing, IEEE Transactions on Networks and System Management, IEEE Network, ACM Computers in Entertainment, AACE Journal of Interactive Learning Research (JILR), and ACM Computer Communications Review.

19. I have co-chaired a number of conferences and workshops including the IEEE International Conference on Network Protocols (ICNP), ACM International Conference on Next Generation Communication (CoNext), IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), International Conference on Communication Systems and Networks (COMSNETS), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), the International Workshop On Wireless Network Measurement (WiNMee), ACM Sigcomm Workshop on Challenged Networks (CHANTS), the Network Group Communication (NGC) workshop, and the Global Internet Symposium; and I have been on the program committee of numerous conferences.

20. Furthermore, in the courses I teach, the class spends significant time covering all aspects of the Internet including each of the layers of the Open System Interconnect (OSI) protocol stack commonly used in the Internet. These layers include the physical and data link

layers and their handling of signal modulation, error control, and data transmission. I also teach DOCSIS, DSL, and other standardized protocols for communicating across a variety of physical media including cable systems, telephone lines, wireless, and high-speed Local Area Networks (LANs). I teach the configuration and operation of switches, routers, and gateways including routing and forwarding and the numerous respective protocols as they are standardized and used throughout the Internet. Topics include a wide variety of standardized Internet protocols at the Network Layer (Layer 3), Transport Layer (Layer 4), and above.

21. In addition to having co-founded a technology company myself, I have worked for, consulted with, and collaborated with companies such as IBM, Hitachi Telecom, Digital Fountain, RealNetworks, Intel Research, Cisco Systems, and Lockheed Martin.

22. I am a Member of the Association of Computing Machinery (ACM) and a Fellow of the Institute of Electrical and Electronics Engineers (IEEE).

23. My current CV is attached to this report as Exhibit 1.

## III. Field of invention and ordinary skill in the art.

24. The field of the inventions disclosed and claimed in the ‘608 and ‘302 patents is the distribution of video files and, in particular, the sharing of video in streaming video format over a network. *See* ‘608 at 1:19-21 (“TECHNICAL FIELD”) (“This invention relates generally to the distribution of video segments. More particularly, the invention relates to sharing video in streaming video format over a network.”); ‘302 at 1:17-21(“TECHNICAL FIELD”) (“This invention relates generally to the distribution of video segments. More particularly, the invention relates to sharing in streaming video format over a network a video to which an advertisement selected by the sender of the video has been attached.”).

25. With respect to the patents-in-suit, a person of ordinary skill in the art in the time period around 2000 would have had the equivalent of a four-year degree from an accredited institution (usually denoted as a B.S. degree) in computer science, computer engineering or the equivalent, and experience with, or exposure to, the field of video and video transmission. A person of ordinary skill in the art would also have had approximately two years of professional experience in the field. Additional graduate education could substitute for professional experience, while significant experience in the field might substitute for formal education.

## IV. Approach.

26. My opinions are based on my review of the specification and claims of the patents and their prosecution histories, technical references and literature that I believe provide guidance on the state of the art and related vocabulary in the approximately 2000 time frame, as well as my education and experience.

## V. Claim terms.

27. Below I provide opinions about what a person of ordinary skill in the art in the time period around 2000 would have understood certain terms in claims of the '608 and '302 patents to mean.

### A. "streaming video file comprising a streaming video format" ('608, claims 1, 14; '302, claims 1, 14).

28. In my review of the patents and their prosecution histories, I have seen nothing that indicates that the patentee uses the terms "streaming video file comprising a streaming video format" in a manner different from their customary and ordinary meaning to one of ordinary skill in the art at the time of the inventions. The patents and prosecution histories include no alternate

definitions for these terms and they use the terms consistently with how they would have been understood by one of ordinary skill.

29. In my opinion, the customary and ordinary meaning to one of ordinary skill in the art of "streaming video file comprising a streaming video format" is "video file containing data arranged in a way that the file is capable of (a) being transmitted over a network and (b) being played before all of its data is fully transmitted."

30. A video file includes data that, when played through an appropriate viewer, produces a video. The "format" of a video file refers to the way the data is arranged in the file. *See, e.g., Random House Webster's Computer & Internet Dictionary* (3rd ed. 1999) at 224 ("format" means "a particular arrangement.") (Ex. 2). Video files can include data arranged in different ways and can thus have different formats.

31. Video files with different formats can have different properties or characteristics. For example, the ISO 9660 optical disk format is used to record, on a sector-by-sector basis, for example, a DVD of a movie. Video files stored on a DVD can be encoded using this format but would not be used for streaming because this format lacks the one characteristic that defines a video file format as a "*streaming* video format" and the video file that includes the video data as a "*streaming* video file"—namely, that the data is arranged in a way that the file is capable of not only being transmitted over a network but also of being played by the user before all of its data is fully transmitted.

32. This meaning of "streaming" to one of ordinary skill in the art has remained unchanged since the time of the inventions, as the definitions in technical dictionaries uniformly demonstrate. For example,

- **streaming**: Delivering audio or video signals in real time, <u>without waiting for a whole file to download before playing it</u>.

-*Barron's Dictionary of Computer and Internet Terms* 444 (6th ed. 1998) (Ex. 3).

- **streaming:** A technique for transferring data such that it can be processed as a steady and continuous stream. … With streaming, the client browser or plug-in can start displaying the data before the entire file has been transmitted.
  -*Random House Webster's Computer & Internet Dictionary* 531 (3rd ed. 1999) (Ex. 2).

- **streaming video:** An internet video delivery technology that sends video data as continuous, compressed stream that is played back on the fly. Like streaming audio, streaming videos begin playing almost immediately.
  -*Webster's New World Dictionary of Computer Terms* 492 (6th ed. 1997) (Ex. 4).

- **streaming**: On the Internet, the process of delivering information, especially multimedia sound or video, in a steady flow that the recipient can access as the file is being transmitted.
  -*Microsoft Computer Dictionary* 499 (5th ed. 2002) (Ex. 5).

- **streaming**: The ability to play sound or video files in REAL TIME as they are received from a web site, rather than having to download the whole file to a local disk before playing it.."
  -*The Penguin Concise Dictionary of Computing* 422 (1st abridged ed. 2003) (Ex. 6).

- **streaming video**: Video which is transmitted over a computer network in a manner which allows for viewing while the transmission is in progress. Once transmission begins, a given time interval is buffered in the receiving computer, and images may be accessed while the download is being completed."
  -*Wiley Electrical and Electronic Engineering Dictionary* 752 (1st ed. 2004) (Ex. 7).

- **streaming**: Delivering audio or video signals in real time, without waiting for a whole file to download before playing it.
  -*Barron's Dictionary of Computer and Internet Terms* 475 (11th ed. 2013) (Ex. 8).

- **streaming**: The process of providing a steady flow of audio or video data so that an Internet user is able to access it as it is transmitted.
  -*Oxford Dictionary of Computing* 494 (6th ed. 2008) (Ex. 9).

- **streaming video**: On a computer network, a method of sending video data as a continuous, compressed stream that is played back on-the-fly. Like streaming audio, streaming videos being playing almost immediately.
  -*Webster's New World Computer Dictionary* 356 (10th ed. 2003) (Ex. 10).

33. I understand that Defendants have replaced the term "streaming video format" with the language "format characteristics and format identifiers." In my opinion, having "format characteristics and format identifiers" does not reflect the plain and ordinary meaning of the claim language to one of ordinary skill in the art. Defendants' proposal uses non-technical terms that one of ordinary skill in the art (like any lay person) would understand to mean "features or properties that can be used to identify a format." *See, e.g., Merriam Webster's Collegiate Dictionary* (11th ed. 2009) (Ex. 11) at 207 ("characteristic" is a "distinguishing trait, quality or property"), at 616 ("identifier" is "one that identifies"). Nothing about having "features or properties that can be used to identify a format" is unique to "*streaming* video format." Any video format, including those that are not "video streaming formats" can have "format characteristics and format identifiers."

34. Moreover, I have reviewed the intrinsic record of the patents and have found nothing that would lead one of ordinary skill in the art to adopt Defendants' proposed limitation. I found only one reference to "format characteristics and format identifiers," which I reproduce here:

> An analyzer module 1530 determines whether the received video segment is in a streaming video format. The determination of a format can be carried out by comparing the format to known format characteristics and format identifiers.

'608, 14:22-25.

35. One of ordinary skill in the art, reading this passage (or any other passage in the intrinsic record), would not think to impose "including format characteristics and format identifiers" limitation on the claim language. This passage is describing "analyzer module 1530," which is relevant to a feature of the patent that is not even part of the claims (the

unclaimed step of analyzing the format of the video file instead of the claimed step of converting the format of the video file).

36. Moreover, one of ordinary skill in the art would recognize that the passage describes “analyzer module 1530,” not the “streaming video file comprising streaming video format,” as having “known format characteristics and format identifiers.” There is no requirement (or even any suggestion) in the patent that, for its analysis of the video file’s format, the “analyzer module 1530” must compare its “known format characteristics and format identifiers” to the contents of the video file; it could just as readily compare its “known format characteristics and format identifiers” to information about the file’s format that is communicated separately from and independent of the file itself. For example, using a protocol like HTTP, information about the file could be sent in a separate HTTP connection. These techniques would have been known to a person of ordinary skill in the art at the time of the inventions.

**B. “embedding the identification tag comprising the video frame image into a webpage” (’608, claims 1, 14) / “embedding the identification tag into a web page” (’302 claims 1, 14).**

37. In my review of the patents and their prosecution histories, I have seen nothing that indicates that the patentee uses the language “embedding the identification tag … into a webpage” in a manner different from its customary and ordinary meaning to one of ordinary skill in the art at the time of the inventions. The patents and prosecution histories include no alternate definitions for these terms and they use the terms consistently with how they would have been understood by one of ordinary skill.

38. In my opinion, the customary and ordinary meaning to one of ordinary skill in the art of “embedding the identification tag … into a webpage” does not mean anything different to a

person of ordinary skill in the art than it would to a layperson: “including the identification tag … in a webpage so that it appears to a user as part of the webpage.”

39. This is consistent with how the term “embedded” is used throughout the patents. For example.:

- “[A] video segment embedded into the remote website so that a viewer who visits the remote website sees the video segment as part of the page that is presented.”
  ‘302, 7:1-3; 16:65-67.
- “[T]he viewer … can be served the video as an embedded portion of a Web page.”
  ‘302 patent, Abstract.
- “In one embodiment, the identification tag can be embedded in a Web page so that a visitor to the Web page can activate the identification tag.”
  ‘608 patent, 8:17-20.

40. I understand that Defendants’ have taken the position that “webpage” should be construed as “website remote from the receiving computers.” In my opinion, this construction is contrary to the customary and ordinary meaning to one of ordinary skill in the art of the term “webpage.”

41. As reflected in the technical literature at the time of the invention, one of ordinary skill in the art would have understood a “web page” to refer to a “document” or “file” on the World Wide Web. For example,

- **web page:** A document on the World Wide Web ….
  -*Random House Webster’s Computer & Internet Dictionary* 606 (3rd ed. 1999) (Ex. 2).
- **web page:** A World Wide Web document. ...
  -*McGraw Hill Computer Desktop Encyclopedia* 1057 (9th ed. 2001) (Ex. 12).

42. In contrast, one of ordinary skill in the art would have understood “website” to refer to the “location” or “server” that stores these documents or files.

- **web site:** A site (location) on the World Wide Web. Each Web site contains a home page, which is the first document users see when they enter the site. The site might also contain additional documents and files.
  -*Random House Webster's Computer & Internet Dictionary* 606 (3rd ed. 1999) (Ex. 2).

- **web site:** A server that contains Web pages and other files which is online to the Internet 24 hours a day.
  -*McGraw Hill Computer Desktop Encyclopedia* 1060 (9th ed. 2001) (Ex. 12).

43. Accordingly, changing the term "web page" to "web site" changes the meaning of the claim to one of ordinary skill in the art. It introduces the concept of location—i.e., where the web page documents or files are stored—when in fact the concept of location is absent from the claims.

44. Moreover, I see no support from the intrinsic record to import the limitation "website remote from the receiving computer" in place of "webpage." There is no disclosure in the specification or prosecution history, like an express of implicit definition different from its ordinary meaning, that would cause one of ordinary skill in the art to interpret "web page" as "website."

45. There is also no disclosure in the intrinsic record to support the further restriction that "web page" should be construed as "website remote from the receiving computer." In fact, the patents do not include a single reference to a "website remote from the receiving computer." To the contrary, when the patents do refer to a "remote website," they do so in the context of the viewer experience, i.e., the person viewing the webpage. For example:

- "View video on remote website" '608, Fig. 1D; '302, Fig 1A.

- "Video that can be viewed on a remote website 83 (e.g., a video segment embedded into the remote website so that a viewer who visits the remote website sees the video segment as part of the page that is presented)" '608, 65-67; '302, 7:1-3

Accordingly, one of ordinary skill in the art, reading the patent specifications, would recognize that, when the patents refer to a "remote website," they are referring a website that is remote from the viewer, not remote from the receiving computer.

**C. "comprising a video frame image representing a subject matter of the streaming video file and identifying the streaming video file" ('608, claims 1, 14) / "comprises a video frame image selected from the streaming video file, the video frame image representing a subject matter of the streaming video file" ('302, claim 2).**

46. In my review of the patents and their prosecution histories, I have seen nothing that indicates that the patentee uses these claims terms in a manner different from their customary and ordinary meaning to one of ordinary skill in the art at the time of the inventions. The patents and their prosecution histories include no alternate definitions for these terms and they use the terms consistently with how they would have been understood by one of ordinary skill.

47. In my opinion, the customary and ordinary meaning to one of ordinary skill in the art of "comprising a video frame image representing a subject matter of the streaming video file and identifying the streaming video file" from claims 1 and 14 of the '608 patent is "including one or more still images from a sequence of images in the video file that is used as a reference image to identify the video and is informative as to a subject matter contained in the video."

48. In my opinion, the customary and ordinary meaning to one of ordinary skill in the art of the similar claim language from claim 2 of the '302 patent, "comprises a video frame image selected from the streaming video file, the video frame image representing a subject

matter of the streaming video file," is "includes one or more still images from a sequence of images in the video file that is informative as to a subject matter contained in the video."[1]

49. In particular, these constructions reflect the plain and ordinary meaning of a "video frame image" as a "still image in a sequence of images." For example,

- **frame:** In video and animation, a single image in a sequence of images. See under FPS.
  -*Random House Webster's Computer & Internet Dictionary* 228 (3rd ed. 1999) (Ex. 2).

- **frame:** One in a succession of pictures in a video or animation. When displayed rapidly one after the other, successive frames give the impression of movement.
  -*Barron's Dictionary of Computer and Internet Terms* 192 (6th ed. 1998) (Ex. 3).

- **frame:** In animation and video, one of the still images that, when played at a rapid speed (see frame rate), produces the illusion of continuous movement.
  -*Webster's New World Dictionary of Computer Terms* 208 (6th ed. 1997) (Ex. 4).

50. The remaining language of the claim—i.e. that the video frame image "represent[] a subject matter of" and "identify[]" the streaming video file—are not terms of art that have a meaning any different from how they would be understood by lay person. The plain and ordinary meaning of these terms, as informed the specification, is reflected in VideoShare's proposed constructions as "informative as to a subject matter contained in the video" and "used as a reference image to identify the video." Moreover, VideoShare's proposed construction is consistent with the specifications' description of the "video frame image." For example, the Summary of the Invention describes the "video frame image" identifier is "an image that represents the content or subject matter of the video." '608, 2:1-2; '302:66-2:1; *see also* '608, 22:54-64; '302, 16:54-58 (teaching that the "thumbnail identifier," or "still image… identifier" is informative as "the subject matter or content of the video.").

---

[1] It is my understanding that it is a rule of claim construction that the article "a" should be construed as "one or more" when it follows the term "comprising."

51. I understand that Defendants attempt to import two requirements into the claim language—that "the video frame image" must (1) be "the middle image of the entire streaming video file, as measured by the temporal duration of the file" and (2) include "a URL or hyperlink to the streaming video file."

52. Neither of these requirements would occur to one of ordinary skill in the art, upon reading the claim language here. Indeed, when implementing a system that includes a video frame image to represent the subject matter of, and to identify, the streaming video file, there is no particular reason why one of ordinary skill would think to require that the middle image, as opposed to any other image, be used. Instead, any image of the video file could serve this purpose. Similarly, there is nothing in the claim language that would lead one of ordinary skill in the art to believe that the "video frame image" must somehow also include a URL or hyperlink. That would be independent of how a "video frame image" is typically used to identify a video file—i.e., as a reference image that can be visually recognized.

53. Moreover, upon reading the intrinsic record of the patents, no person of ordinary skill in the art would believe that the ordinary meaning of the claim language should be restricted to include either of these limitations. In particular, the patents teach that the video frame image need not be the middle image but can instead be selected by the user:

- "In another embodiment, the selection of an image from which to make the 'thumbnail' can be left to the discretion of the user."
  -'608, 22:66-23:1

54. Similarly, there is no disclosure that could lead one of ordinary skill to believe that the "video frame image" must include a URL or hyperlink to the video file. Instead, one of

ordinary skill in the art would understand that the patents teach that the "video frame image" identifies the video via its role as a reference image, i.e., an identifier that the viewer can recognize:

- "[A] still image … used as a reference image to the entire video file. It is an identifier of the subject matter or content of the video that a user or a viewer can readily recognize."
  '302, 16:54-63; '608, 55-57.

- The "snapshot of the video file [is] an identifier that a user or a viewer can observe."
  '302, 15:6-7; '608. 21:39-40.

**D. "executing in response to receiving the video, an automated function automatically performing each of" ('608, claims 1, 14).**

55. I understand that the parties dispute what is meant by the claim language "executing an automated function automatically performing." In my opinion, the plain and ordinary meaning of these terms to one of ordinary skill in the art is reflected in VideoShare's proposal: carrying out computer instructions to accomplish the function instead of depending on a human operator, i.e., without the need for intervention by a human operator. This is reflected in the technical dictionary definitions for these terms. For example:

- **execute:** To run a program (follow instructions in the program)
  -*McGraw Hill Computer Desktop Encyclopedia* at 55, 331 (9th ed. 2001) (Ex. 12).

- **execute:** To carry out an instruction, process, or computer program
  -*IEEE Standard Dictionary of Electrical and Electronics Terms* 378 (6th ed. 1996) (Ex. 13).

- **automation:** The replacement of manual operations by computerized methods
  -*McGraw Hill Computer Desktop Encyclopedia* at 55, 331 (9th ed. 2001) (Ex. 12).

- **automatic:** Pertaining to a function … that … functions without intervention by a human operator"
  -*IEEE Standard Dictionary of Electrical and Electronics Terms* 378 (6th ed. 1996) (Ex. 13).

56. There is nothing about the plain and ordinary meaning of the claim language, "executing an automated function automatically performing," that would lead one of ordinary

skill in the art to believe that Defendants' proposed limitation—"without a user interaction with the receiving computer" —is appropriate. To the contrary, automatic, or automated, functions are regularly performed with interaction occurring between the user and the system during performance of the automated function. To give a couple of examples, when you insert a CD into the player, the system automatically plays the music, but this does not preclude the user from interacting with the system during that time—e.g., adjusting the volume. Indeed, other automated systems require interaction with the user while the automated function is being performed. For example, the tax software TurboTax automates tax calculations, but still requires interactions with the user (e.g., inputs of various data) throughout the automated process.

57. Moreover, this understanding of one of ordinary skill in the art is confirmed by the patent specifications, which explicitly teach interactions between the user and the receiving computer during the automated process that is the subject of this dispute. For example, figure 6A of the patents is a flowchart that illustrates an embodiment of the patent that includes the automated function we are discussing. *See, e.g.*, '608, 6:44-46 ("FIG. 6A is a flow diagram of an embodiment of the invention in which software automates a number of steps," including those at issue here). And the patent teaches that, at various steps while this automated function is being automatically performed, the user interacts with the receiving computer. For example,

- <u>Step 640: (the user tells the receiving computer which image to use as an identifier in the identification tag</u>): "the selection of an image from which to make the 'thumbnail' can be left to the discretion of the user."
  '608, 22:67-23:1

- <u>Step 630: (the user tells the receiving computer the desired bitrate of the video</u>: "[t]he user can select the desired bitrate by using the 'Settings Tab.'"
  -'608, 22:30-31.

**E. "first computer" / "second computer" / "third computer" / "fourth computer" / "fifth computer" / "sixth computer" / "seventh computer" / "eighth computer" / "ninth computer" ('302, claim 14).**

58. I understand that Defendants contend that that one of ordinary skill in the art at the time of the invention would have understood the term "computer" not to describe a structure, but to instead be a substitute for a "nonce word" like "means," "widget," "mechanism," "element," "or "module." I disagree. For example, you could not ask one of ordinary skill in the art to pass you a "means," "widget," "mechanism," "element," "or "module" because those terms, standing alone, have no meaning as the name of a structure. However, you could ask for a "computer" because it is a structure—in this case, a tangible product—with a known meaning.

59. The term "computer" has a structural definition that is well-known in the art: a machine that processes data according to a set of instructions. For example:

- **computer:** a machine capable of executing instructions on data. The distinguishing feature of a computer is its ability to store its own instructions.
  -Barron's *Dictionary of Computer and Internet Terms* 96 (6th ed. 1998) (Ex. 3).

- **computer:** A general-purpose machine that processes data according to a set of instructions that are stored internally either temporarily or permanently.
  -*McGraw Hill Computer Desktop Encyclopedia* 168 (9th ed. 2001) (Ex. 12).

- **computer:** A machine that can follow instructions to alter data in a desirable way and to perform at least some operations without human intervention.
  -*Webster's New World Computer Dictionary* 84 (10th ed. 2003) (Ex. 10).

- **computer:** A machine that performs computations. In everyday usage the term suggests a programmable computer, which means one that can be made to perform many different computations by running different programs.
  -*The Penguin Concise Dictionary of Computing* 84 (1st ed. 2003) (Ex. 6).

As reflected in these technical dictionaries, the term "computer" undeniably has a meaning that evokes structure to one of ordinary skill in the art.

DATED: August 21, 2015

Kevin C Almeroth
Kevin Almeroth, Ph.D.